# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BYRON DEAN WALLER,

        Plaintiff/Petitioner - Appellant,

v.

MICHAEL JAMES WALLER et al,

        Defendant/Respondent -
        Appellee.

Case No.  **15-2117**

Appellant/Petitioner's Opening Brief

## NOTICE AND INSTRUCTIONS

    If you proceed on appeal pro se, the court will accept a properly completed Form A-12 in lieu of a formal brief.   This form is intended to guide you in presenting your appellate issues and arguments to the court.   <u>If you need more space, additional pages may be attached.</u>   A short statement of each issue presented for review should precede your argument.   Citations to legal authority may also be included.   This brief should fully set forth all of the arguments that you wish the court to consider in connection with this case.

    New issues raised for the first time on appeal generally will not be considered.   An appeal is not a retrial but rather a <u>review</u> of the proceedings in the district court.   A copy of the completed form must be served on all opposing counsel and on all unrepresented parties and a proper certificate of service furnished to this court.   A form certificate is attached.



Legal Mail
Provided to
Blackwater River Correctional Facility
on DEC 0 2 2015 for mailing.
Initials

APPELLANT / PETITIONER'S OPENING BRIEF

## I. STATEMENT OF CASE

Appellant and Appellee's are brothers, and Paula, his wife. Our parents had a joint will leaving each brother half of their estate. (This will is missing). Years after our mother died Appellees formed a confidential relationship with our father, (James Byron Waller), by way of undue influence from Appellees, They met with an attorney in the hospital room where our father had suffered his second massive stroke. The questionable attorney let our father execute a new will and transfer of property, deed, Which left Appellee our parents entire estate. The Appellee's did not even bother to check with our father's physicians. Our father was medicated and mentally incapable of executing a new will. Appellees relayed negitive information to our father to make him dislike Appellant. THE APPELLANT KNOWS EXACTLY WHAT APPELLEES TOLD OUR FATHER TO MAKE HIM WANT TO DISINHERIT APPELLANT. BUT WANTS TO KEEP THAT FOR TRIAL. (It is Appellants strategy not to tell Appellee's because they would make up a story to dispute it, prior to trial). IT'S APPELLANT'S SECRET SUPRISE FOR THE TRIER OF FACT. The Appellant claims that the Appellees tortiously interfered with his inheritance, Had it not been for Appellee's tortious conduct he would have recieved his rightful inheritance. APPELLANT HAS NEVER CLAIMED HE CAN PROVE HIS ALLEGATIONS WITHOUT WITNESS TESTIMONY.

## 2. STATEMENT OF FACTS RELEVANT TO ISSUES PRESENTED FOR REVIEW

Appellant wishes the Court to acknowledge another case, inwhere Vickie Lynn Marshall placed an issue in question whether, J. Howard Marshall II, possessed the mental capacity requisite to make any changes to the terms of the trust. J. Howard Marshall II promised Vickie Lynn Marshall half of all his property. All of these promises were verbal and not supported by any evidence. Vickie Lynn Marshall claimed E. Pierce Marshall had destroyed documents. Vickie Lynn Marshall testified extensively regarding her expectancy of a gift from J. Howard Marshall II. That E. Pierce Marshall destroyed documents all in effort to prevent J. Howard Marshall II from giving a gift to Vickie Lynn Marshall. The United States

District Court determined that E. Pierce Marshall had tortiously interfered with Vickie Lynn Marshall's expected gift from the decedent. Vickie Lynn Marshall was awarded millions in compensatory and punitive damages. see, Marshall, in re, 392 F.3d 1118 (9th Cir. 2004); Marshall v. Marshall, 126 S.Ct. 1735 (2006). Vickie Lynn Marshall had plenty of lawyers and apparently had no difficulty requesting and recieving discovery.

In the above case, the situation is remarkably similar to Appellants. Here, the Appellant has placed a issue of whether James Byron Waller (our father) possessed the mental capacity requisite to execute a new will and property deed. James Byron Waller promised Appellant half of all his property. Also, these promises were verbal and not supported by any evidence (the original joint will is missing). Appellant claims Appellee's destroyed the original will. (they are the only people with access to the family home). Appellant claims that Appellees unduly influenced James Byron Waller in his mentally weakened condition and tortiously interfered with his expected gift from James Byron Waller. Oddly though, Appellant has been denied requested discovery. Appellant has not been given any opportunity to call a single witness in support of his claims.

Appellants claim does not involve the administration of an estate, the probate of a will, or any other purely probate matter. Provoked by Appellants wrongful behaviour, Appellants claim alleges a widely recognized tort of interference with a gift or inheritance. He seeks personam judgment against Appellee's, not the probate or innulment of a will.

Appellant was continally led to believe the proceeds from the sale of the family home would be used to pay our father's nursing home bills. But, Appellee's plan, had the family home deeded to him. This made the estate appear valueless. Therefore, letting the Government pick up the check for the nursing home bills. This is the beginning of Appellee's tortious conduct and deception to the Court. Appellant never expected this conduct/behaviour.

-3-

3.    STATEMENT OF ISSUES.

a.    FIRST ISSUE:

Trial Court was in error in it's finding "APPELLANT'S COMPLAINT WAS TIME-BARRED" when granting Defendants Summary judgment on that motion,

ARGUMENT AND AUTHORITIES:

Appellant attached a "COVER SHEET" when he re-filed this complaint on October 9, 2014. He explains, the complaint was filed three previous times, Twice in the Southern District of Florida 1.) on July 14, 2011, Case No: 1:11-cv-22547 and 2.) on September 21, 2011, Case No:1:11-cv-23596. Both dismissed by the court for lack of jurisdiction, without prejudice.

On November 13, 2012, Appellant first filed the complaint in the District of New Mexico. Case No: 12-CV-1234-SMV-ACT. But Appellant became ill physically and mentally, due to the rigors and stress associated in the lawsuit and was unable to concentrate or even write a letter.(NoTE: Every complaint filed has been exactly alike, no changes at all, except for cover sheets). The Appellant voluntarily withdrew that complaint which was dismissed without prejudice on April 8, 2013

Trial courts Memorandum Opinion And Order, Document: 39 Page 8, states: Neither party disputes that on January 27, 2011 Plaintiff recieved mailed copies of the documents from his brother. From these facts, as of January 27, 2011, by his own admission, Plaintiff possessed sufficient facts to bring a claim "3"

"3" Out of an abundance of caution, the Court has undertaken an equitable tolling analysis to determine whether Plaintiffs previous

filing and voluntary withdrawl of his identical lawsuit against Defendants equitably tolled the statute of limitations on this lawsuit. The Court finds that, as here, when a Plaintiff files a case, and then voluntarily fails to prosecute it, the statute is not equitably tolled. See Gathman-Matotan Architects & Planners, Inc. v. State Dep't of Fin. & Admin., 1990-NMSC-013, ¶ 13, 109 N.M. 492, 494, 787 P.2d 411, 413 (1990).

Where a party raises a statute of limitations defense, the general rule is that summary judgment is inappropriate if the limitations period depends on disputed facts. Wolf v. Preferred Risk Life Ins. Co., 728 F.2d at 1306. Here, there are no disputed facts as to when Plaintiff learned that he had an actionable claim. Plaintiff filed immediate lawsuit more than three years later, on October 14, 2014, and accordingly his claims are barred by N.M. Stat. Ann. § 37-1-8

There are more undisputed facts the Trial Court failed to consider. The Appellant stated, he filed complaint three previous times, see "COVER SHEET" for this complaint, Document 1. Appellant believes the Court merely mistakenly failed to toll the time for the first two. Although case filed in New Mexico District Court would not have been tolled. The two times filed in Florida District Court would have tolled the time. When Plaintiff realized he had an actionable claim on January 27, 2011 it took him nearly six months, to research his claim and be able to file the first complaint on July 14, 2011. The complaint was dismissed on August 31, 2011, to refile when complaint properly establishes jurisdiction. On September 28, 2011 (a month and a half later) he refiled the complaint alleging Defendants had systematic and regular contacts in Florida. The Court found Defendants lack sufficient minimum contacts in Florida. Again, the complaint was dismissed on September 21, 2012. Lack of jurisdiction. (one year later), without prejudice to re-file in proper jurisdiction.

-5-

Although the District Court of Florida, ultimately dismissed both complaints for lack of jurisdiction, The Appellant had dilligently and vigorously prosecuted his claim. Which was re-filed in New Mexico on November 13, 2012 (less than two months later).

## APPELLANTS TOLLING CALCULATIONS

The day Appellant became aware of sufficient
facts to bring claim. _____  January 27, 2011

It took 5 mo. 18 days to file on _____  July 14, 2011

Florida case no: 1:11-CV-22547 dismissed on __  August 31, 2011

"see Appendix A"            TIME TOLLED     1 mo. 17 days

Re-filed on _____  September 28, 2011

Florida case no: 1:11-cv-23596 dismissed on __  September 21, 2012

"see Appendix B"            TIME TOLLED    11 mo. 23 days

Retiled on _____  November 13, 2012

New Mexico case no: 12-CV-1234 SMV ACT dismissed on_  April 8, 2013
                    (voluntarily withdrawl)
                         TIME TOLLED       0 mo. 0 days

Re-filed on _____  October 9, 2014

New Mexico case no 1:14-cv-00921-LH-KBM          to present

┌─────────────────────────────────────────────────────┐
│ Appellant's aware of facts to file:  January 27, 2011 │
│                                      October 9, 2014  │
│ Present filing:                                       │
└─────────────────────────────────────────────────────┘

         TOTAL TIME "+" 3 yrs. 9 mo. 18 days

TIME TOLLED case no: 1:11-cv-22547 _____ 1 mo. 17 days App."A"
TIME TOLLED case no: 1:11-cv-23596 _____ 11 mo. 23 days App."B"
TIME TOLLED case no: 1:14-cv-1234 SMV·ACT _____ 0

         TOTAL TIME TOLLED "−" 1 yr. 1 mo. 10 days

SUBTRACT TIME TOLLED       3 yrs. 9 mo. 18 days
FROM TOTAL TIME        −   1 yr. 1 mo. 10 days
TOTAL TIME UNTOLLED        2 yrs. 8 mo. 8 days (within 3 yrs)

Accordingly, Plaintiff's claims are not barred from the three year statute of limitations, N.M.Stat.Ann. § 37-1-8.

Plaintiff supplied all relevant previous filings to the Court in the "COVER SHEET" for present complaint. Through no fault on Plaintiffs part. The Honorable District Court of New Mexico inadvertently made an error by not taking into consideration the previous filings when calculating TIME TOLLED. Further, the Plaintiff has had no opportunity to present, nor felt the need to present this uncontradicted evidence. Appellant has stated he was not Time-Barred throughout the proceedings. And believed his pro se allegations would be held as true. Defendants Motion For Summary Judgment was granted in error.

b. SECOND ISSUE:

Trial Court was in error when it failed to rule on "PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANTS NOTICE OF COMPLETION OF BRIEFING AND PLAINTIFF'S MOTION FOR EXTENSION OF TIME."(Which was filed in Reply to Defendants Response (Document 29) where the Plaintiff further indicated need for extension of time (Document 30)).

ARGUMENT AND AUTHORITIES:

Plaintiffs reply to Defendants response in opposition to Plaintiffs motion in opposition to Defendants notice of completion of briefing and Plaintiffs motion for extension of time was filed on April 30, 2015 (Document 30). Appellant requested a 60 day extension of time to respond to Defendants motion for complete summary judgment. The Appellants motion was filed pursuant to Fed. R. Civ. P. Rule 6(b). The Appellant requested an additional 60 days, to file a response, to begin at the time the motion was granted. See Appendix C" APPELLANT WAS WAITING ON A RULING FROM THE COURT ON THAT MOTION, WHEN THE COURT GRANTED SUMMARY JUDGEMENT TO DEFENDANTS, WHICH WAS ON JULY 2, 2015 (approx. 60 days after filing for extension of time).

Appellant believes due Court error, Plaintiffs' Reply To Defendants Response In Opposition To Plaintiffs' Motion In Opposition To Defendants Notice Of Completion Of Briefing And Plaintiff's Motion For Extension Of Time (Document 30) has never been ruled on. This prejudiced Appellant by having a ligitimate motion before the Court for an Extension of Time, when Summary Judgment was granted in Defendants favor. Plaintiffs, Extension of Time Argument begins on "page 9" of "Appendix C". It was error not to grant Plaintiff's ligitimate request for an extension of time, to be able to file a meaningful response to Defendants Motion for Complete Summary Judgment. Defendants Motion For Summary Judgment was granted in error. There was a pending motion before the Court for extension of time.

C.    THIRD ISSUE:

Trial Court was in error not granting "PLAINTIFFS APPLICATION FOR APPOINTMENT OF COUNSEL" pursuant to 28 U.S.C.A §1915. And error not to grant "PLAINTIFF'S AFFIDAVIT, PURSUANT TO FED. R. CIV.P. Rule 56(d) WHEN FACTS ARE UNAVAILABLE TO NONMOVANT"

ARGUMENT AND AUTHORITIES

There are many issues concerning why Appellants Application for Appointment of Counsel, (Document 27), should have been granted. He wishes to start with the Trial Courts findings. In the "Order" "denying appointment of counsel" (Document 37) filed July 2, 2015 it states on "page 4": To prevail in his tort suit, the Plaintiff must show specific facts - direct or inferenail - demonstrating the Defendants tortivous interference. The Plaintiff can accomplish this pro se, he appears to have a firm grasp of the fundamental issues in his case and appears to be capable of presenting his case intelligently and coherently. In "Order" (Document 38) filed July 7, 2015 gives a very detailed explanation on "pages 4 and 5" why, Plaintiffs Affidavit, pursuant to Fed. R. Civ. P. Rule 56 (d) was insufficient. "WITH THE SAME STROKE OF THE PEN" on the

"SAME DAY". On one document (37), Appellant could present his claim pro se. On another document (38), give's a detailed explanation of how he did it wrong. (was unable to present his claim adequately). After holding he could present his claim pro se. Trail Court explained that Appellants, Rule 56(d) Affidavit failed to identify: (1) The probable facts not available, (2) Why those facts cannot be presented currently, (3) What steps have been taken to obtain these facts, and (4) How additional time will enable the party those facts and rebut the motion for summary judgment. By the Courts own admission, the Appellant failed to present his case sufficiently, but ruled that he could in the preceeding document.

"THIS IS UNFAIR TO A PRO SE LITIGANT," Appellant must also mention that, Fed. R. Civ. P. Rule 56(d) makes no mention of the four prongs required to satisfy requirements of the affidavit. Appellant read the rule and did what it said. An attorney must know about the requirements. Appellant filed the affidavit honestly and expressed in detail his need for discovery to the best of his knowledge. A pro se litigant cannot be expected to know rules that are not mentioned in Federal Rules of Civil Procedure. This clearly supports Appellants need for Court Appointed Counsel. "FOR THE RECORD" if Appellant were given another opportunity to file his Rule 56(d) Affidavit, Appellant can meet the four prong requirement. To put it very simply, Appellant cannot present his claims if he does not know how.

This "document (38)" states, on "page 5 and 6". Athough a Rule 56(d) motion is to be liberally treated, such liberal treatment is not appropriate where, as here, the motion lacks in merit. Plaintiff has failed to show by affidavit that a lack of discovery is what would prevent him from presenting facts essential to justify his opposition. Instead, <u>Plaintiffs affidavit establishes only that there are "FACTS UNAVAILABLE TO HIM."</u> Now, Appellant is not an attorney.

But, Fed. R. Civ. P. Rule 56 (d) "WHEN FACTS ARE UNAVAILABLE TO NONMOVANT." By the Courts own admission it would appear Appellant followed the rule. Appellant clearly needed an attorney in this matter, Not being able to know the law has truly prejudice Appellant. With discovery Appellant can win this lawsuit. "APPELLEE'S MET WITH A QUESTIONABLE ATTORNEY AT OUR FATHER'S HOSPITAL BEDSIDE, AFTER HIS SECOND MASSIVE STROKE, ALTHOUGH LUCID, HAD THE MIND OF A CHILD. WITHOUT CHECKING WITH PHYSICIANS, HAD OUR FATHER EXECUTE A WILL AND PROPERTY DEED, WHILE MEDICATED AND MENTALLY IMPAIRED. APPELLANT CAN PROVE THEIR WRONGDOING, JUST ALLOW REASONABLE DISCOVERY..." Denying Appellants Rule 56 (d) Affidavit is so unfair... It almost seems Appellant is disliked.

Further, Appellant has stated, on record, "numerous times" that he only has access to "Westlaw Computer Program" at the prison law library. The program does not contain any United States District Court cases, or New Mexico and Missouri Statutes. Only United States Circuit Court cases and Florida Statutes, are available on Westlaw. Defendants Motion for Complete Summary Judgment, (Document 19), filed February 10, 2015, states caselaw and statutes Appellant has no access to! Appellant pointed this out in his, "Application for Appointment of Counsel" (Document 27) on "page 37" and in the "Reply to Defendants Response etc, and Motion for Extension of Time (Document 30) on "page 11". Appellant was unable to research caselaw, or statutes in opposition to Defendants motion for summary judgment. "NOT TO MENTION PRISON LAW LIBRARY ONLY ALLOWS COMPUTER ACCESS TWO HOURS PER WEEK". The following cases and statutes could not be researched, or investigated:

1.) Lintz v. Skipski, 807 F.S. 1299 (W.D.Mich. 1992)
2.) City of Las Cruces v. El Paso Electric Co., 904 F.L. 1236, 1248 (D.N.M. 1995).

3.) Santa Fe Village Venture v. City of Albuquerque, 914 F.S. 478, (D.N.M. 1995).

4.) Hammons v. Tyle, et al, 745 S.W. 2d 253 (Mo 1988).

5.) In re marraige of Harp, 228 S.W. 3d 681.

6.) Bushman v. Barlow, 292 S.W. 1039, 1052 (1929).

7.) Gross v. Burggraf Const. Co.

8.) Fulton v. Freeland, 118 S.W. 12 (Mo 1909).

9.) Section 472.013 R.S.M.O. 2000

10.) Section 516.120 (4) RS.Mo. 2000

11.) Commerce Bank, N.A. v. Blasdel, 141 S.W. 3d. 434 (Mo. App. W.D. 2004).

12.) Gianella v. Gianella, 234 S.W. 3d. 526, 530 (Mo. 2008).

13.) N.M.S.A. Section 37-1-4, 1978.

In fact there are only "five cases" Appellant could research in Defendant's Motion for Summary Judgment. There is no possible way Appellant could file a meaningful, intelligent, response to Defendants Motion for Summary Judgment. Without more time for discovery and appointment of counsel." AT THE MINIMUM A MOTION FOR EXTENSION OF TIME SHOULD HAVE BEEN GRANTED." Appellant could have possibly found controlling cases.

APPELLANT HAS THE UTMOST RESPECT AND ADMIRATION FOR ALL FEDERAL JUDGES AND WILL CONTINUE HIS LOYALTY, BUT DENIAL OF APPELLANTS APPLICATION FOR COUNSEL AND THE DENIAL OF HIS RULE 56 (d) AFFIDAVIT, MUST BE FUNDAMENTAL ERROR.

Now, moving on to Appellants mental health issues and how they're relevant to this lawsuit. Appellant suffers from serious mental illness. Back in 2003 and 2004, He was hospitalized and was seen by no less than seven different psychiatrists. All concluding to the following diagnosis', "PERMANENTLY DISABLED, PREVENTS PUBLIC CONTACT," due to severe anxiety. "See Appendix 6", BIPOLAR EFFECTIVE DISORDER, DEPRESSION, AGORAPHOBIA WITH PANIC ATTACKS. (agoraphobia: fear of the public, fear of authority figures,

and fear of being in an unescapable situation). ACUTE REATION TO STRESS, and NEUROTIC DISORDER. "see Appendix F", SERIOUS DEPRESSION, SERIOUS ANXIETY OR TENSION, HALLUCINATIONS, TROUBLE UNDERSTANDING, CONCENTRATING OR REMEMBERING" see appendix E", ANXIETY DISORDER, BIPOLAR DISORDER, P.T.S.D. (Post-traumatic Stress disorder), "see Appendix H". It is without question, HIGHLY QUALIFIED MENTAL HEALTH PROFESSIONALS HAVE FOUND APPELLANT WITH SERIOUS MENTAL INFIRMITIES.

Here is what a friend stated in a report to the Social Security Administration back in 2004. "in pertinent part": On days he feels bad he doesn't feel he can leave the house (afraid to go outside). He just stays in with all the drapes drawn and won't even answer the phone. He can't be out in public, work around people, can't sleep for days at a time, When he's having an episode he won't go out or let anyone inside, When he's having a manic phase he spends money he doesn't have, The effect of his illness affects; talking, completing tasks, concentration and getting along with others, He cannot concentrate very long and requires alot of sleep. Cannot get along with authority figures. Left work because of anxiety attack. Cannot handle stress. He completely falls apart and shuts down, won't answer the phone, won't leave his house. You never know from day to day whether he is going to be upset and paranoid or feeling normal. He won't talk about what scares him, he just says he's scared to leave the house. "see Appendix D". THE "APPELLEE", Michael James Waller stated the following in 2006, to Appellants Judge, Byron's (Appellant) main problem is that he suffers from Bi-Polar syndrome which leads him to sometimes make bad choices. He can be fine for quite awhile but when he becomes depressed and his Bi-Polar then surfaces causing him to make poor choices. "see Appendix I", It is without question, FRIENDS AND EVEN

-12-

APPELLEE HAVE FOUND APPELLANT SUFFERS FROM SERIOUS MENTAL INFIRMITIES.

The Appellants mental health documentation speaks for itself. There is, without a doubt, clear and conclusive evidence confirming Appellants severe mental illness. Appellant states: Sure he can tell a story, can copy court motions, adhere to a format, do legal research, (even though he's a high school dropout). But, as evidenced by the above documentation, has fear of other peoples authority figures, and inescapable situations. In prison, Appellant has a regular routine, but fears going to the recreation yard and cannot associate with other prisoners. APPELLANT STATES FOR THE RECORD, WHEN HE'S CONFRONTED WITH FACE TO FACE VERBAL CONVERSATION WITH A STRANGER, SEVERE ANXIETY KICKS IN. APPELLANT GETS CONFUSED AND CANNOT THINK STRAIGHT. HE STARTS SCRATCHING HIS BODY THAT DOES NOT ITCH AND HAS INVOLUNTARY MOVEMENTS, HIS HEART STARTS PALPITATING, HE CANNOT BREATH WELL. APPELLANT'S ANXIETY HAS MADE HIM UNABLE TO TALK AT TIMES. For nine years Appellant has seen a "PSYCHOLOGIST" every thirty days. He has seen a "PSYCHIATRIST" every ninety days. They have discovered the reason for the fear, "just recently." Appellant is being treated, still to this day. But there is no cure.

In no way will Appellant be able to present his case fairly, prose. He is up against seasoned, well-educated veteran attorneys at the "LAW FIRM" hired by Appellees. The discovery deadlines, complexity of factual and legal issues, conflicting evidence, conflicting testimony, cross-examinations, expert witnesses, medical evidence, When Appellant can concentrate it's not for long, but if he does and gets side-tracked, then he simply cannot remember what he was concentrating about. It would be impossible to depose a witness, cross examine an expert witness. APPELLANT'S ENTIRE CASE REVOLVES AROUND CONFLICTING WITNESS TESTIMONY. The rigors that attend litigation would cause Appellant to fall apart, shut down, mentally and physically. Appellant cannot comprehend the proceedings as they occur, or the complexities anticipated or arising during discovery.

He cannot conduct any evidence gathering and preparing and responding to motions has already been deemed improper by the District Court.

In Appellants Application for Appointment of Counsel (Document 27), pages 28 through 35, specifically with regard to his mental health, education and work history. However, Order Denying Motion for Appointment of counsel (Document 37), failed to mention Appellants strongest issue in support of his need for Court appointed counsel. "Appellants confirmed and undisputed mental disability". Appellant advised the Court of the exact same documentation as presented here. NO CONSIDERATION WAS MADE TO EVEN, ENTERTAIN OR ARGUE, APPELLANTS' SEVERE MENTAL HEALTH INFIRMITIES AND THE PREJUDICE APPELLANT WILL SUFFER ASSOCIATED WITH HIS MENTAL ILLNESS, Instead they argue, McCarthy v. Wienberg, 753 F.2d 836 (10th Cir. 1985). "Which is an excelent case and supports Appellants disabilities". It states the Plaintiff was "debilitated by multiple sclerosis, his eyesight failing, his hearing unpredictable and his ability to communicate impaired." The case further states, Plaintiffs ability to communicate and complexity of medical issues requiring expert opinion, that, the Court should have granted appointment of counsel. (NOTE: Appellant provided six pages of need for an "EXPERT MEDICAL WITNESS" in his Application for Appointment of counsel. pages 22 through 28. (Document 27)). The case goes on to say the Plaintiff must have the ability to investigate relevant and crucial facts. And to be able to consider the nature of factual issues raised. Appellant is, "debilitated by mental illness, he fears public contact, authority figures, inescapable situations, he's bipolar, has panic attacks, documented serious anxiety, hallucinations and has trouble understanding, concentrating or remembering". Appellants ability to communicate is at the least as bad, if not worse than McCarthy. "Appellants permanently disabled because his severe anxiety prevents public contact." Dr. Paula Hughson, "see again Appendix G".

Nearly ninety percent of Appellants case involves conflicting witness testimony. And the Appellant did read McCarthy. McCarthy

quotes: Macklin v. Freake, 650 F.2d 885 (8th Cir. 1981). The Maclin court considered the type of evidence to be presented to the fact finder. Appointment of counsel is favored if evidence is to consist of conflicting testimony. There it quotes: Drone v. Hutto, 565 F.2d 543 (8th Cir. 1977). District Court ordered to reconsider appointing counsel because plaintiff suffered from mental disease and, therefore, could not conduct his case unaided. We note that Appellants assertion of his need for counsel pursuant to 28 U.S.C.A § 1915(d) does appear to have merit, for the record discloses that Appellant, a pauper may suffer from mental disease. See, e.g., Scott v. Plante, Inc., 532 F.2d 939 (3rd Cir. 1976).

In addition the order quotes, Hill v. SmithKline Beecham Corp. 393 F.3d 1111 (10th Cir. 2004). In Hill, he was given an opportunity to secure expert witnesses and failed. Here, Appellant has not had that opportunity to even try. He's not been allowed discovery. It is part of the record Appellant requires an expert medical witness. In the "Cover Sheet" to Complaint (Document 1). Cover sheet, paragraph 12. "Plaintiff intends to ask the Court for an expert witness. In the Application for Appointment of Counsel (Document 27) "page 25" he states, the Plaintiff will need to locate, investigate, question, depose, and secure for trial testimony our father's doctor's, neurologists, and supporting staff." A MEDICAL EXPERT MAY NOT AGREE WITH APPELLEE'S THAT THERE WAS AN URGENT NEED FOR A WILL AND TRANSFER OF PROPERTY DEED BE EXECUTED IN A HOSPITAL ROOM, AND TESTIFY OUR FATHER WAS VERY ILL AND WAS HIGHLY SUSCEPTIBLE TO UNDUE INFLUENCE BASED ON MEDICAL EVIDENCE." Medical records must also be obtained to verify prescribed medication, patients condition, current treatments, with doctors opinions and notes concerning this matter.

A "MASSIVE STROKE" is lost blood volume causing oxygen deprivation to the brain, causing severe loss of cognitive abilities, ability to plan and coordinate actions, unaware of the consequences of their behaviour, susceptible to impulsive actions, confusion, forgetfulness, emotional instability and substantially impaired mental capacity. An expert witness will testify, "When oxygen deprivation or bleeding

oops -15-   -14-

occur in the brain, that section of the brain is no longer useful, the receptors in the brain must change routes and use another section. This completely changes a person's thoughts and rational judgment. The brain simply does not work the same. The whole chemistry of the brain is changed. The Appellants claims are factually and legally complex. He requires complex medical evidence and retention of at least one expert witness. Appellant is incapable of engaging in any investigation or able to locate key witnesses or evidence. Appellants impaired in his ability when complex factual data must be developed. He does not have sufficient ability or training to recognize, organize, or able to elicit testimony to develop such data. In McCarthy, the Court held the plaintiff lacked "the capacity to investigate and develop the crucial medical testimony" McCarthy also survived defendants motion for summary judgment. Under these circumstances, the Court required counsel to be appointed, to help the litigant investigate and present his claims. (In Appellants case he did not recieve a fair opportunity to respond to Appellees motion for summary judgment) Finally, the order denying motion for appointment of counsel (Document 37) states, plaintiff has failed to demonstrate the existence of any special circumstances of physical impairment such as those demonstrated by the pro se plaintiff in McCarthy. "APPELLANT STRONGLY DISAGREES." It was fundamentally unfair to deny Appellant a court appointed attorney because of the above stated facts. THE DENIAL OF THE APPELLANT COUNSEL IS IN ERROR. The District Court abused its discretion in failing to appoint counsel. ONE MORE THING, THE RUCKS FACTOR, Rucks v. Boergermann, 57 F.3d 978, (10th Cir. 1995) (1) the merits of a prisoners claims, CANNOT BE APPLIED HERE. THERE HAS BEEN NO DISCOVERY. ONE AFFIDAVIT BY AN INTERESTED PARTY, THE APPELLEE, CANNOT PROVE APPELLANT'S CLAIMS HAVE NO MERIT, APPELLEE MERELY DENIED APPELLANT'S CLAIMS. THERE IS ALSO A QUESTION CONCERNING THE APPELLEE'S CREDIBILITY. THERE IS ABSOLUTELY NO EVIDENCE APPELLANT'S CLAIMS ARE WITHOUT MERIT... NONE...

-16-

d.   FORTH ISSUE :

Trial Court was in error "GRANTING SUMMARY JUDGMENT
IN APPELLEES FAVOR". and "AFFIDAVIT OF MICHAEL JAMES WALLER
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT CONTAINS FALSE
STATEMENTS" and "APPELLEES HAVE SHOWN NO MATERIAL ISSUE OF
FACT TO DEFEAT APPELLANTS ALLEGATIONS." they have failed to
demonstrate entitlement to summary judgment beyond a
reasonable doubt.  Appellee's Affidavit (Document 19-1)

## ARGUMENT AND AUTHORITIES :

Fed. R. Civ. P. Rule 56(c). Summary judgment is appropriate "ONLY"
if "' the pleadings, depositions, answers to interrogatories, and
addmissions on file, "TOGETHER WITH THE AFFIDAVITS, IF ANY", show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Quaker State Minit-Lube, Inc., v. Fireman's Fund Ins. Co., 52 F.3d
1522, 1527 (10th Cir. 1995) Only disputes of facts that might affect
the outcome of the case will properly preclude entry of summary
judgment, Anderson v. Liberty Lobby Inc. 477 U.S. 242, 247-48 (1986)
Fnitially, the moving party bears the burden of showing that no
genuine issue of material fact exist, Shapolia v. Los Alamos Nat'l
Lab., 992 F.2d 1033, 1036 (10th Cir. 1993).

"THE APPELLEES HAVE NOT MET THE BURDEN THAT
NO GENUINE ISSUE OF MATERIAL FACT EXIST."

Appellee's affidavit does state undisputed facts. Our father
suffered a stroke and was in the hospital, a lawyer met him there
and executed documents (will and transfer property deed). He went
to a nursing home in Santa Fe, New Mexico, then soon died. The
Appellees undisputed facts "fail to address" any of the Appellant's
allegations of undue influence and tortious interference with

-17-

an inheritance. In Appellee's affidavit (Document 19-1). Paragraphs 11, 12, 13, 14, 16, 19, 30, 32 and 33, merely deny Appellants allegations. Upon Appellee's opinion "ONLY", their opinion is not supported by any evidence whatsoever. Further, in paragraph's 27 and 30 he makes allegations about Appellant he cannot prove. And in paragraph's 26 and 29 he outright lies, that the estate was valueless. He states: (26) The personal property which he gave me was almost valueless, but there were some guns, assorted tools and a 1995 Mercury which had some value. (29) There was nothing left of any value in the home. All contents were given away or discarded, with exception of a lawnmower which I sold for $50.00, THIS IS IN THE SWORN TO TRUTH AFFIDAVIT.

The real truth is, our mother had an extensive valuable jewelry collection valued up to $50,000.00. Wedding ring, 2 rows of one carrot diamonds accross the entire top of the ring. Today, could appraise around $30,000.00. Numerous gold and diamond earrings, rings, chains, neclaces, one heavy charm braclet with charms from around the world, antique rings and watches. Our father had a gold neclace with lion pendant with ruby eyes. A pure gold Antique Railroad Pocket Watch, of unknown value. Also an "OMEGA" Antique automatic rewinding wristwatch. A similar Omega Wristwatch sold on E-Bay for $30,000.00 just recently. Eight piece Antique China, with Antique water and wine glasses. Antique silverware to match. Plus an Antique candy dish collection, (some passed down generations) Over twenty Antique crystal candy bowls. Our mothers pride and joy, was her collection. (It even warrented a five foot tall, wood and glass display case). Worth another $5,000.00 at least. One dish may have been worth $5,000.00, to a dealer of antiques?

"JEWELRY, CHINA, AND SILVER ARE LISTED IN THE WILL, BUT NOT IN APPELLEES SWORN AFFIDAVIT, APPELLANT DOES NOT KNOW WHY THEY DECIEVE THE COURT."

Appellant strongly believes, this falsified affidavit calls into question the ultimate integrity of the fact finding process.

The Appellee is not a credible witness by his own actions and behaviour. He simply cannot be believed at this point. Plus, a real estate broker would appraise the "FAMILY HOME" to be worth an estimated $120,000.00 in Appellant's view. Although, the sale of the family home is never, "NOT ONCE", mentioned. Appellant alleges this is more deception on the Court. To make it appear he recieved nothing and Appellants claim's are without merit.

APPELLEES AFFIDAVIT (Document 19-1) DENY'S THE APPELLANT'S CLAIM OF UNDUE INFLUENCE AND TORTIOUS INTERFERENCE WITH AN INHERITANCE. "THATS ALL". APPELLEES OPINION. ON THE OTHER HAND, APPELLANTS Fed.R.Civ.P. Rule 56(d) AFFIDAVIT, (Document 33) CLAIMS APPELLEE USED UNDUE INFLUENCE AND TORTIOUSLY INTERFERRED WITH HIS INHERITANCE, THAT HE CAN, WITHOUT QUESTION, PROVE HIS CLAIM GIVEN DISCOVERY, "THATS ALL" APPELLANTS OPINION.

WHAT WE HAVE HERE IS, "HE SAID THIS" — "HE SAID THAT".. NO OTHER EVIDENCE, NO GENUINE ISSUE OF MATERIAL FACT ON EITHER SIDE. APPELLANT SAYS HE DID, APPELLEE SAYS HE DID NOT.".. IT IS THAT SIMPLE. APPELLEES HAVE NOT MET THE BURDEN TO JUSTIFY SUMMARY JUDGMENT. THERE IS A FACTUAL DISPUTE BETWEEN PARTIES, BUT NIETHER SIDE HAS SUPPORTED THEIRS BY MATERIAL FACTS... AND NOW, THERES A QUESTION OF APPELLEES CREDIBILITY

ONLY TWO AFFIDAVITS, THAT ARE CONFLICTING, HAVE BEEN SUBMITTED TO THE COURT. NO DEPOSITIONS, ANSWERS TO INTERROGATORIES, ADMISSIONS ON FILE. AFFIDAVITS CANNOT BE USED AS A SUBSTITUTE FOR A TRIAL OF THE CASE.

Motion for summary judgment shall be granted "ONLY" if "'The pleadings, depositions, answers to interrogatories, and admissions on file, "TOGETHER WITH AFFIDAVITS, IF ANY" show there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law. In bonafide factual disputes, affidavits cannot be used as a substitute for a trial of the case. Hanley v. Chrysler Motor Corporation, 433 F.2d 708 (10th Cir.(N.M.) 1970). The rule allowing for summary judgment is not intended to substitute trial by affidavit, Eastern Tunneling Corporation v. Southgate Sanitation Dist. Arapahoe County, 487 F.Supp 109 (10th Cir. (Colo.) 1979).

The rules allowing for summary judgment are not intended to substitute trial by affidavit for the give and take in open Court. As the Tenth Circuit said in National Aviation Underwriters v. Altus Flying, 555 F.2d 778, 784 (10th Cir. 1977). The Court must view summary judgment papers in the light most favorable to the party opposing the motion (citation omitted) We must consider factual inferences tending to show triable issues in the light most favorable to the existence of such issues and summary judgment must be denied unless movant demonstrates his entitlement to it beyond a reasonable doubt (citation omitted) Still, the Court of Appeals has also said in, Bruce v. Martin-Marietta Corp., 544 F.2d 442, 445 (10th Cir. 1976) that, conclusory allegations do not establish an issue of fact under Rule 56 (citation omitted) "The Trial Court may pierce the pleadings by determining "DEPOSITIONAL PROOF" - "ADMISSIONS" AND "AFFIDAVITS" in the record whether any material issues of fact exist. "APPELLANT HAS CONTRAVERTED APPELLEES AFFIDAVIT"

AFFIDAVITS ARE NOT A SUBSTITUTE FOR TRIAL AND SUMMARY JUDGMENT IS IMPROPER WHERE AN ISSUE TURNS ON CREDIBILITY. IT IS PARTICULARLY WRONG TO BASE SUMMARY JUDGMENT OF THE DEPOSITION (in instant case affidavit) OF AN INTERESTED PARTY ON FACTS ONLY KNOWN TO HIM, A SITUATION WHERE DEMEANOR EVIDENCE MIGHT SERVE AS REAL EVIDENCE TO PERSUADE A TRIER OF FACT TO REJECT HIS TESTIMONY. NATIONAL AVIATION UNDERWRITERS V. ALTUS FLYING, 555 F.2d 778 (10th Cir. 1977).

Further, Appellant's pro se pleadings were not taken as true. Appellant's affidavit had opinion but Appellant believes his opinion to be true. Appellant can prove his opinion is the truth with reasonable discovery. Also, Appellant's pleadings were not held less stringent than those drafted by lawyers. In ruling on a motion for summary judgment, the evidence of nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Tolan v. Cotton, 134 S.Ct. 1861 (2014). See also; Estelle v. Gamble, 97 S.Ct. 285 (1976). And, we must take well-plead allegations as true and view them in light most favorable to the nonmoving party, Harris v. Owens, 264 F.3d 1282 (10th Cir. (Colo.) 2001). IN APPELLANT'S CASE THIS WAS NOT DONE.

Appellant was not allowed already requested (at the time he filed the complain) discovery. "See Appendix J" Pages 16 and 17 of Complaint" (Document 1). Note; Paragraph 40, Byron (Appellant) will need this Honorable Court to issue a Court Order to force Mike and Paula (Appellees) to comply with reasonable discovery. Paragraph 41, Byron requests Mike follow rules of Federal Civil Procedure in Byron's attempt to ensure a smooth and quick exchange of basic information. IT IS MORE LIKELY THAN NOT, JUST A HANDFUL OF THE WITNESSES IN PARAGRAPH 40 (25) WILL BE NEEDED TO TESTIFY TO PROVE APPELLANT'S ALLEGATIONS. Yet, the Court did nothing to help Appellant secure discovery, even after Appellant requested a Court Order. Appellees are not just going to admit to their wrongdoing. Appellant knew Appellee's would not cooperate with reasonable discovery. But Appellant's pleadings were ignored. Discovery was requested, therefore, District Court should grant request for delay in ruling on summary judgment motion in order to permit additional discovery when those opposing summary judgment motion has been unable to obtain responses to his discovery requests and discovery sought would be essential to opposing summary judgment and relevant to the

issues presented by the motion for summary judgment,
Baron Services Inc., v. Media Wheather Innovations LLC,
717 F. 3d 907 (C.A. Fed (Ala.) 2013). The Court goes on to say,
affidavit or declaration is not required by party moving for
delay in District Courts ruling on summary judgment motion
in order to obtain additional discovery.

"IN OUR VIEW, THE PLAIN LANGUAGE OF RULE 56 (c)
MANDATES THE ENTRY OF SUMMARY JUDGMENT, AFTER
ADEQUATE TIME FOR DISCOVERY" CELOTEX CORP. V.
CATRETT, 106 S. CT. 2548 (1986), NOTE: A PARTY
SHOULD BE ALLOWED TIME FOR DISCOVERY UNDER RULE
56 (f), WHERE PARTY HAS NOT HAD PRIOR OPPORITUNITY
TO CONDUCT DISCOVERY.

Because the burden on party resisting summary judgment is not a
heavy one, one must conclusively justify his entitlement to the
shelter of the rule allowing for a continuance to conduct
discovery by presenting specific facts explaining the inability
to make a substantive response. Fed. R. Civ. P. Rule 56 (f).
Virgilio v. Ryland Group Inc., 680 F. 3d 1329 (11th Cir. (Fla.) 2012).
"CLEARLY THE APPELLANT HAS SATISFIED THAT BURDEN." the
statement, that Appellant has failed to identify the existence of
any evidence that would defeat their motion for summary judgment
is without merit... NO EVIDENCE HAS BEEN PRESENTED BY APPELLEE IN
THEIR MOTION FOR SUMMARY JUDGMENT. ONLY THE "QUESTIONABLE" SWORN
AFFIDAVIT OF APPELLEE. All reasonable doubts on questions of fact must
be resolved in favor of the party opposing summary judgment, Anderson v.
Liberty Lobby Inc. 106 S. Ct. 2505 (1986).

## CONCLUSION

Appellants claims are not time-barred. It was error not to rule
on, and grant Appellant motion for extension of time. It was error not
to grant Court appointed counsel. It was error not to accept Appellants
Rule 56 (d) Affidavit. Summary judgment was granted in error. Appellee
falsified his supporting affidavit and his credibility is in question. Also,
Appellees have not met their burden that no genuine issue of material
fact exist. and Appellant was denied discovery in error. The District
Court abused their discretion granting summary judgment to Appellees.
In addition, Appellant expressed the need for a medical expert.

-22-

**4. Do you think the district court applied the wrong law? If so, what law do you want applied?** No.

**5. Did the district court incorrectly decide the facts? If so, what facts?** Yes, this has already been discribed.

**6. Did the district court fail to consider important grounds for relief? If so, what grounds?** Yes, this has already been discribed.

**7. Do you feel that there are any other reasons why the district court's judgment was wrong? If so, what?** Yes, this has already been discribed.

**8. What action do you want this court to take in your case?**

REVERSE AND REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH WHATEVER THIS COURT DEEMS JUST AND PROPER.

**9. Do you think the court should hear oral argument in this case? If so, why?** It would be nice if Appellant's whole story could be heard.

_____Dec. 2, 2015_____          _____Byron W~_____
Date                                               Signature

## CERTIFICATE OF SERVICE

I hereby certify that on ___December 2, 2015___ I sent a copy of
(date)

the Appellant/Petitioner's Opening Brief to ___Randolph B. Felker, Atty___

___at Law. (for Appellees)___ , at ___911 Old Pecos Trail___
(Opposing Party or Attorney)

___Santa Fe, New Mexico 87505___ , the last known address/email

address, by ___U.S. MAIL___ .
(state method of service)

UNDER THE MAILBOX RULE, I AFFIRM UNDER PENALTY FOR PERJURY THAT
I PLACE THIS OPENING BRIEF WITH FIRST CLASS POSTAGE PREPAID IN THE
PRISON MAIL SYSTEM.

___Dec. 2, 2015___                    ___[signature]___
Date                                  Signature

---

## CERTIFICATE OF COMPLIANCE

I certify that the total number of pages I am submitting as my
Appellant/Petitioner's Opening Brief is 30 pages or less or alternatively, if the total
number of pages exceeds 30, I certify that I have counted the number of words and
the total is _____ , which is less than 14,000.   I understand that if my
Appellant/Petitioner's Opening Brief exceeds 14,000 words, my brief may be
stricken and the appeal dismissed.

___Dec. 2, 2015___                    ___[signature]___
Date                                  Signature

A-12   Appellant/Petitioner's Opening Brief – 06/09

## AFFIDAVIT OF MICHAEL JAMES WALLER IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

STATE OF NEW MEXICO ⟩
                                    ⟩ ss.
COUNTY OF SANTA FE ⟩

I, Michael James Waller, having first being duly sworn upon oath, state that the following is true and correct of my own personal knowledge:

1.     I am the oldest son of James Byron Waller and Fredora Jane Waller. Plaintiff Byron Waller is my younger brother, and is my sole sibling.

2.     James Byron Waller and Fredora Jane Waller had only two children.

3.     Fredora Waller died on June 17, 2004. She had no will and her estate was not probated.

4.     Fredora Waller, my mother, had some insurance policies and designated Michael Waller (me), Byron Waller (the Plaintiff), and my father James Byron Waller as co-beneficiaries on some or all of those insurance policies. I was a beneficiary of an insurance policy or policies on my mother's life administered by the Missouri State Employees Retirement System (MOSER) of insurance benefits totaling approximately $18,549.66.

5.     On information and belief, my brother (the Plaintiff) received his one-third beneficiary payment(s) from my mother's insurance policies, including about $18,549.66 of life insurance proceeds from the Missouri State Employees Retirement System.

6.     Upon my father's urgings, I lent him the $18,549.66 which I was to receive from my mother's insurance policy(ies).

7.     Subsequently, my father executed a promissory note which was backdated to August 2, 2004 to me in the amount of $18,549.66, without interest. This was to reflect and document the loan I had made him of my share of the proceeds of my mother's insurance policy(ies).

8.     James Byron Waller executed a Last Will and Testament on April 10, 2006 in Missouri. The document is hereinafter referred to as the "Will." A true and accurate copy of the Will is attached as Exhibit "A" to the Complaint.

9.     The Missouri attorney who prepared the will was Charles A. James. The attorney who prepared the will was not my attorney, and I had never used him before for any purpose. On information, my aunt, Linda Meyer, had utilized attorney Charles A. James before. I understand that she called the attorney and asked that the attorney meet with my father at the hospital.

**EXHIBIT**

**"A"**

10.    Attorney Charles A. James traveled to the hospital where my father was a patient and talked with my father in the presence of my aunt and me. My father was lucid and was able to communicate with the lawyer, although he had a hard time speaking. My father informed the lawyer as to my father's intentions and directed beneficiaries. My father made it clear to the attorney that my father did not want Plaintiff Byron Waller to receive anything from his Estate.

11.    During the attorney's interview with my father, I learned for the first time that my father didn't want to leave my brother, Byron Waller (Plaintiff), anything in his Will. I had never discussed this with my father before, and I never influenced or attempted to influence my father: (a) not to leave anything in his Will to Byron; or (b) to leave his estate or anything else to me; or (c) deed his home to me. My father was interviewed by the attorney as to what his wishes were. Following that, the attorney returned to my father's hospital room with the following documents: (a) the Will; (b) the beneficiary deed to my father's house and lot; (c) the promissory note attached hereto as Exhibit "1"; (d) a general power of attorney to me and my aunt Linda Meyer; (e) a healthcare power of attorney to me and my aunt, Linda Meyer. I did not influence my father to sign any of those documents.

12.    I did not exercise any undue influence upon James Byron Waller in order to have him name me as the beneficiary of his Estate or to sign the Will or to sign the note. Nor did my wife, Paula Waller, exercise any undue influence upon James Byron Waller in order to have him name me as the beneficiary of his Estate or to sign his Will or the note. Nor did I urge or request James Byron Waller to name me as the beneficiary of his Estate or to sign the Will or to sign the note. Nor did my wife, Paula Waller urge or request James Byron Waller in order to have him name me as the beneficiary of his Estate or to sign his Will or the note

13.    Months before the Will was signed, my father (James Byron Waller) told me that he had "had enough" of Byron Waller, and that he was very angry at Byron. I did nothing to influence my father to dislike or become angry with Byron or to make my father state he had enough of Plaintiff.

14.    In April of 2006, without any urging from me or my wife, my father informed me that he wanted to deed me his home located at 11500 Fox Hall Lane, Florissant, Missouri 63033. Subsequently, on April 10, 2006, my father signed a Beneficiary Deed in Missouri conveying his home to me upon his death. The recording certificate and a true and accurate copy of the Beneficiary Deed which my father signed on April 10, 2006, which was recorded in Missouri on April 18, 2006, at Book 17129, Page 1009-11 of the records of St. Louis County, Missouri is attached to the Complaint as Exhibit "B." The document is hereinafter referred to as the "Deed."

15.    Until approximately March 25, 2006, my father resided at his home in Missouri located at 11500 Fox Hall Lane, Florissant, Missouri 63033. That property is the same property as is referenced in the Deed.

16.    I did not ask my father to deed me his home. I did not influence my father in any way to execute, record or deliver a deed to me for that property. Nor did my wife, Paula Waller, influence James Byron Waller to have him sign the Deed or any other document.

17.    My wife remained in New Mexico during the period when James Byron Waller executed the Deed and Will.

2

18.     The Deed which my father signed was drafted by attorney Charles A. James at approximately the same time he drafted the Will. Both documents were signed at the same meeting with my father and attorney Charles A. James.

19.     I never pressured my father to execute the Deed to me, and never urged or attempted to influence him to do so. It was entirely my father's idea to execute the Deed to me.

21.     On April 6, 2006, my father also executed a power of attorney to me and a health care directive to me. Both were prepared by attorney Charles A. James.

22.     My father resided in his home until he was hospitalized in Missouri because of a stroke on or about March 25, 2006. My father was discharged from the hospital on or about April 18, 2006.

23.     After my father's discharge from the hospital on or about April 18, 2006, he became a resident of the St. Sophia's nursing home near his Missouri residence, and stayed there until approximately June 13, 2006.

24.     At some time after my father commenced his residence at the St. Sophia nursing home in Missouri, my aunt telephoned me and informed me that my father wanted to move to New Mexico. I subsequently flew to Missouri and picked my father up. We traveled by air to Santa Fe, New Mexico, where he took up residence at the Santa Fe Care Center, a nursing home. My father stayed there (Santa Fe Care Center) until his death on June 15, 2007.

25.     My father, James Byron Waller, died on June 15, 2007, while he was a resident of Santa Fe Care Center, a nursing facility located in Santa Fe, New Mexico. He had resided there for about a year. He died of pneumonia and was suffering from a Staphylococcus infection at the time of his death.

26.     Before his death, after my father had been moved to Santa Fe, he gifted (gave) me his remaining personal property. He was in a nursing facility at the time and had no real expectation of ever leaving. The personal property which he gave me was almost valueless, but there were some guns, assorted tools and a 1995 Mercury which had some value. He titled the Mercury in my name and his before his death.

27.     There was a life insurance policy on my father's life which paid me and my brother (Plaintiff Byron Waller) $5,000 apiece. A check for slightly more than $5,000 was paid by the insurance company and deposited into Plaintiff's banking account with the Florida department of Corrections. I talked to Plaintiff on the telephone within weeks of our father's death about the insurance and our father's death. I informed Plaintiff that he was getting nothing from our father's estate except the $5,000 insurance proceeds. He said words to the effect "I know." Plaintiff certainly knew about our father's death shortly after our father's death on June 15, 2007.

28.     When my father died, my father's checking account balance was $2,464. His cremation and burial expenses in Santa Fe totaled $1,565. His death wishes were to have his

ashes spread in Missouri near the Mississippi River. The costs and expenses of accomplishing this and in paying his other bills and expenses exceeded the balance of his checking account. My father's expenses and obligations at the time of his death substantially exceeded the amount of his remaining assets, and after paying my father's debts and the expenses associated with traveling to Missouri to spread his ashes and give away his old furniture, there was nothing left.

29.    My father and my mother were heavy smokers. Their furniture and the contents of their home were smoke ridden and dingy. There was essentially nothing left of any value in my father's Missouri house after the time of his death, and all the contents were given away or discarded, with the exception of a lawnmower which I sold for $50.00.

30.    I never communicated negative information about Plaintiff Byron Waller to my father in order to influence my father to dislike or to disinherit Plaintiff Byron Waller. My father knew that Plaintiff Byron Waller was a convicted felon. According to my father, he had a bad experience with Plaintiff Byron Waller, that he had "had enough" of Byron Waller, and that he was very angry at Byron. I did nothing to influence my father to make to come to those beliefs.

31.    Plaintiff Byron Waller never filed a probate action seeking to probate my father's (James Byron Waller's) estate or to probate my father's Will. Plaintiff Byron Waller has never been appointed as the personal representative, executor or administrator of my father's estate.

32.    I have never interfered with any expectancy of Plaintiff Byron Waller to my father's estate or property. Nor has my wife, Paula Waller, ever interfered with any expectancy of Plaintiff Byron Waller to my father's estate or property. My wife, Paula Waller has never influenced or attempted to influence my father to give me anything, to write a will, of to take any negative action towards Plaintiff.

33.    To my understanding, the Will which my father, James Byron Waller, executed on April 10, 2006 in Missouri was his only will, and James Byron Waller had no previously executed will.

34.    Plaintiff has brought two lawsuits against my wife and I in Florida, and two lawsuits against my wife and I in New Mexico; all for the same claims as are set forth in the present case. The previously filed action in the United States District Court for the District of New Mexico (Civil Case No. CV-14-921 GBW/KBY) is almost identical to the instant matter.


Further, Affiant sayeth naught.

*Michael James Waller*

Michael James Waller

4

STATE OF NEW MEXICO )
                             ) ss.
COUNTY OF SANTA FE )

      SUBSCRIBED AND SWORN to before me this 24th day of January, 2015, by Michael James Waller.

                                     Notary Public

My commission expires:
1/6/2015

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**BYRON DEAN WALLER,**
*Plaintiff,*

**v.**                                    **Case No.: 1:14-CV-00921-LH-KBM**

**MICHAEL JAMES WALLER**
and **PAULA WALLER,**
*Defendant.*

_____/

## AFFIDAVIT, PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56(d) WHEN FACTS ARE UNAVAILABLE TO NONMOVANT

**STATE OF FLORIDA**          }
                             }     SS.
**COUNTY OF SUWANNEE**        }

I,  Byron Dean Waller, having first being duly sworn upon oath, state that the following is true and correct of my own personal knowledge.

1.    Michael James Waller and Paula Waller (Defendants) are brother's and sister-in-law, to me. Our father, James Byron Waller had numerous strokes leaving him mentally impaired before his death.

2.    Defendants formed a confidential relationship with our father in his mentally impaired condition by use of trust and power over our father. The improper use of the trust and power gained them enough control and superiority over our father, and unduly influenced him, which resulted in our father into doing

1

questionable acts he would not otherwise done. Without discovery I cannot prove this claim.

3.   Defendants overmastered our father's free will in his elderly and mentally weakened condition. They disclosed proprietary and negative information to our father about me, intentionally, to turn our father to become upset with me, and against me. Through this unfair persuasion Defendant's unduly influenced our father and tortuously interfered with my expected inheritance. Witness testimony on these issues, will show the fact, Defendants engaged in wrongful acts. **Our father promised me one half of our parent's estate numerous times**.

4.   I will prove Defendants had a confidential relationship with our father. I will prove Defendants disclosed proprietary and negative information to our father, the substance of that information, and how it affected me. **Defendants while residents of New Mexico, from New Mexico, used undue influence against our father which resulted them receiving all our parents estate.** Defendants capitalized on me being a convicted felon and have called me worthless and no-good, to my face.

5.   Without discovery, I am unable to prove my claims. With discovery, I will show precisely through investigation, questioning and cross-examination the truth of my claims. I intend, also to turn defense witnesses into my witnesses, and honest testimony will determine the truth.

2

6.    I have requested discovery in a Letter of Intent to Defendant and in Complaint (Document 1). Although "Notice of Intent and Request for Discovery (Exhibit "A") was premature." I did request discovery. Complaint, Section VI Discovery (Exhibit "B") I am very specific about discovery. (Permission of the Court is not required, I thought). I request "ALL DISCOVERY", but not limited to only discovery listed below.

7.    I requested paragraph 40 (13). In (Exhibit "B") The written, dated and signed list of property in existence at my death. See Last Will and Testament of James B. Waller (Exhibit "C") Article II (a). This list of property has never been provided to me. Additionally, the first paragraph of the Will states: Hereby revoking all former Wills and Codicils which I have made. This statement supports a joint will with our mother which Defendants swear never existed. If there was no former Will, our father would have stated: This is my first and only Will. Also Article II, personal property owned by me included, jewelry, china, and silver. Defendants swear estate was valueless. Defendants clearly mislead this Honorable Court in their sworn affidavit. Leaving out thousands of dollars worth of jewelry.

8.    In request for Discovery paragraph 40 (22) (Exhibit "B") I request names, addresses of our fathers, physicians and primary care givers. In paragraph 40 (24) I request, physicians files, reports, and medical records. In paragraph 40 (25) I request names, addresses of family and friends who could be called as

3

witnesses in support of my claims. I list, "NO LESS THAN TWENTY WITNESSES". Then in paragraph 40 (26) all evidence, material and witnesses that would support my claims.

9.    In paragraph 40 (25) all twenty witnesses, Defendants have all of their contact information, addresses and phone no.'s. Our father had a Rolodex file and two desktop address books, having all family and friends contact information. I have requested these addresses numerous times but Defendants refuse to give me contact information. Many of these witnesses are old. I will have to send out letters just to find out who is still alive, being the fraudulent activity of Defendants (by not furnishing proof of the hospital room executed will until 2011). A lot of the witnesses have information, who is still alive from the time of the April 10, 2006 "Hospital Will" are ones to be interviewed, deposed or give sworn affidavits.

10.    Also in (Exhibit "B") Discover, paragraph 41, states I expect discovery pursuant to Federal Rules of Civil Procedure, Rules 26 to 37. In my attempt to ensure a smooth and quick exchange of basic information. In paragraph 42, I request under Rule 26 (f) to meet my adversary "as soon as practicable" to discuss the case, and paragraph 43, I request this reasonable discovery without cost. I am not an attorney, but it seems clear to me I requested discovery in my Complaint. For unknown reasons these efforts have been unsuccessful.

11.    It is on record I need an expert medical witness. In the "cover sheet" to Complaint (Document 1). Coversheet, paragraph 12. "Plaintiff intends to ask the Court for an expert witness." And in Application for Appointment of Counsel, Section "D", Plaintiffs need for Expert Witness Testimony. In paragraph 26, "the Plaintiff will need to locate, investigate, question, depose, and secure for trial testimony our fathers doctors, neurologists and supporting staff with information concerning this matter." Also "A MEDICAL EXPERT MAY NOT AGREE WITH DEFENDANTS THAT THERE WAS AN URGENT NEED FOR A WILL AND TRANSFER OF PROPERTY DEED BE EXECUTED ON APRIL 10, 2006 IN A HOSPITAL ROOM, AND TESTIFY OUR FATHER WAS VERY ILL AND WAS HIGHLY SUSCEPTIBLE TO UNDUE INFLUENCE BASED ON MEDICAL EVIDENCE." With discovery from an expert medical witness, I can prove our father had severe loss of cognitive abilities, ability to plan and coordinate actions, was unaware of the consequences of his behavior, was susceptive to impulsive actions, confused and forgetful. Without discovery I cannot prove this claim.

12.    It is also on record Defendants used undue influence to turn "ALL FAMILY" against me. In Coversheet to Complaint (Document 1) and Application for Appointment of Counsel. These family members will be able to testify to what they were told by Defendants which made them dislike me. All these witnesses

5

will support Defendants character of using undue influence on our father. Without discovery I cannot prove this claim.

13.    It is also on record in Application for Appointment of Counsel. Linda K. Meyer the other beneficiary to the Hospital Will, was hated by our father. This was the sister who had their mother execute a new will after several strokes, that left our father out of the new will. Linda K. Meyer had first hand experience in executing wills with seriously ill, and knew how to gain trust, power and superiority over our father to execute the hospital will, using her talent in undue influence over the mentally impaired. This woman engaged in wrongful acts. Without discovery, I will be unable to prove how she played a major role in the execution of the Hospital Will. It is undisputed Defendant Michael and Linda K. Meyer secured her attorney and met him at the hospital to execute our fathers last will.

14.    Also on record the prison law library will only provide envelopes and postage for the courts, attorneys, and state officials. Witnesses do not fit into this category, even if I had their addresses. I am totally indigent. I do not know how I will contact witnesses without this Honorable Court's help. One more thing I cannot do without discovery.

15.    I have already requested discovery and have created genuine issues of material fact. I've set forth specific facts discovery will uncover. I have clearly

6

shown good cause, and my inability to discover facts with listed witnesses in Complaint (Document 1). I will disclose more witnesses on Defendants character during discovery. I simply cannot present facts essential to justify opposition to Defendant's Motion for Complete Summary Judgment. Defendants hold every address I need, to date they have refused to give them to me. Defendants do not want me to contact these people, because I can prove their wrong doing. I've requested discovery without success. I will need Defendants to cooperate with discovery, by Court Order if necessary. **Defendants, of course, are not going to admit what they've done**… Without discovery, I will be unable to prove how Defendants tortuously interfered with my expected inheritance.

Further Affiant sayeth naught.

Byron Waller, *pro se*
Suwannee C. I. - Annex
5964 U.S. Highway 90
Live Oak, Florida 32060

7

**STATE OF FLORIDA**

**COUNTY OF SUWANNEE**

The foregoing instrument was acknowledged by me this _____ day of May, 2015

by Byron Dean Waller, who is personally known to me or has produced his

INMATE IDENTIFICATION CARD #K06593 as identification who did take an

oath.

_____
Notary Public

DATE RECEIVED
MAY 1 3 2015
SUWANNEE C.I. - ANNEX
CLASSIFICATION.

_____
My Commission Expires


_____
Notary Seal

9